## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 26 2018, 9:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark E. Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

S.R. (Minor Child)

and

V.E.,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

October 26, 2018

Court of Appeals Case No.
18A-JT-901

Appeal from the Vigo Circuit Court

The Honorable Sarah K. Mullican, Judge

The Honorable Daniel W. Kelly, Magistrate

Trial Court Cause No.
84C01-1708-JT-1161

**Tavitas, Judge.**

# Case Summary

[1] V.E. ("Mother") appeals the termination of her parental rights to S.R. (the "Child"). We affirm.

# Issue

[2] Based upon Mother's arguments, we restate the issue as whether the Department of Child Services proved, by clear and convincing evidence, that termination of Mother's parental rights is in the best interests of the Child.

# Facts

[3] The Child was born to Mother and P.R. ("Father") on September 11, 2012.[1] In 2013 and 2014, Vigo County Department of Child Services ("DCS") substantiated claims that Mother's boyfriend, R.H., physically abused Mother. DCS also substantiated two claims of neglect by Mother regarding "two children that were no longer in Mother's care." App. Vol. II p. 11.

[4] On December 15, 2015, R.H. held Mother hostage in a standoff with law enforcement. DCS conducted an assessment regarding the Child and established that R.H., who periodically lived with Mother, physically abused

---

[1] The trial court also terminated Father's parental rights as to the Child. Father is not a party to this appeal.

Mother, "forced her to smoke meth[amphetamine] [and] threaten[ed] to beat her up if she refused." *Id*.

[5] In December 2015, Mother tested positive for methamphetamine, amphetamine, and marijuana. On December 30, 2015, DCS filed a Child in Need of Services ("CHINS") petition regarding the Child and, subsequently, initiated an "in-home CHINS" matter.[2] *Id*. at 12.

[6] On February 18, 2016, Mother assaulted the Child's half-brother at the Boys and Girls Club in Terre Haute. Investigators went to Mother's residence, where "[Mother] appeared erratic and under the influence and refused to screen." Tr. Vol. II p. 39. DCS removed the Child and his half-brother from Mother's care and placed the Child with his maternal great-grandparents.

[7] The trial court adjudicated the Child as a CHINS in April 2016. At a subsequent hearing, on May 17, 2016, the trial court entered a dispositional order under which Mother was ordered to undergo addictions and mental health treatment, case management assessments, medication management, and skills building. Mother was also ordered to follow the service providers' recommendations stemming from the assessments, including participation in individual and group therapy, regular drug screens, and supervised visits. Lastly, Mother was to obtain employment and to comply with DCS's case plan.

---

[2] In an "in-home CHINS" matter, the trial court allows the child to remain in the care of the parent, while the parent receives services from service providers.

[8] During the pendency of the CHINS proceedings, Mother made minimal progress toward the case plan objectives. Mother failed to timely complete her addictions assessment, to obtain employment, to secure stable housing, to regularly submit to drug screens, and to refrain from drug use. On September 6, 2017, DCS filed a petition to terminate Mother's and Father's parental rights to the Child. On March 5, 2018, the trial court conducted a fact-finding hearing.

[9] At the hearing, Julie McBride, who served as the initial family case manager at the outset of the DCS matter, testified that Mother: (1) failed to complete an addictions assessment until March 2017, which was ten months after DCS's initial referral; (2) failed to obtain employment; (3) was evicted and periodically "homeless or couch surfing, [or] staying with friends"; (4) "no-show[ed]" for the first six months of drug screens; and (5) "struggled with parenting and maintaining the children"[3] during the supervised visits. Tr. Vol. II pp. 13, 15.

[10] McBride also testified that, during her tenure as family case manager, Mother no-showed for twenty-one of sixty-five scheduled drug screens, refused five drug screens, and failed thirty-four drug screens. Mother tested positive for methamphetamine, amphetamine, marijuana, opiates, and tramadol. *Id*. at 9, 13. McBride also testified that, for a five-month period during the proceedings, Mother lived with her brother, against whom DCS had substantiated claims of sexual abuse of Mother's older children. McBride testified that DCS would not

---

[3] Child and his half-brother were involved in the supervised visits.

restore S.R. to Mother's care if Mother continued to reside with her brother. Lastly, McBride testified that "[Mother] didn't engage really in any of the services that could have been helpful to her with her addiction during the time that [McBride] worked with her." *Id.* at 13.

[11] Next, DCS permanency family case manager, Kylie Hickmon, testified that Mother failed to successfully establish stable housing and employment. Hickmon also testified as follows regarding the twenty-three drug screens that were administered to Mother during Hickmon's tenure as family case manager:

> [Only] [f]ive [screens] . . . were clean of all substances, one was a refusal, two [were] no-shows, four were positive for THC [marijuana], the last being November 27th, [2017], and one positive for methamphetamine on February 21st[, 2018].

*Id.* at 22. Hickmon testified that she lacked confidence in Mother's ability to remedy Mother's substance abuse issues, housing instability, and unemployment; she testified further that termination of Mother's parental rights was in the Child's best interests. Lastly, Hickmon testified that the adoptive placement offers support and "long term permanency" for the Child, who has special needs and "needs structure and stability." *Id.* at 33.

[12] Amanda McCullough of the Hamilton Center testified that, for two years, she supervised Mother's visitation with the Child. According to McCullough, although Mother attended most of her scheduled supervised visits and exhibited some improvement, Mother also exhibited frustration from "[c]hild behavior," had "an attitude that . . . [Mother] didn't want to be there[,]" and "would end

[supervised visits] on her own or get frustrated with the way things were going and just wouldn't stay the whole time." *Id.* at 56, 59.

[13] Court appointed special advocate ("CASA"), Amy Jukes, served as CASA for the Child for two years and "maybe spoke to the mother one time." *Id.* at 63. Jukes testified that, "although I've reached out to [Mother], she has not had any contact with me." *Id.* at 66. Jukes testified that, after observing some visitations, she "does not believe that there is a bond from what I can see with [the Child and Mother]." *Id.* at 63. Lastly, Jukes testified that she supported the termination of Mother's parental rights.

[14] At the close of the hearing, the trial court took the matter under advisement. On March 9, 2018, the trial court entered an order terminating Mother's and Father's parental relationships with the Child. In its order, the trial court acknowledged that Mother, "in very recent weeks ha[d] begun taking some steps forward"; however, the trial court determined that DCS established, by clear and convincing evidence, the allegations contained in the petition to terminate Mother's parental rights. The trial court's order stated:

> 4. There is a reasonable probability that the conditions which resulted in the removal of the child from his parents will not be remedied or the reasons for placement outside of the home of the parents will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the child as follows:
>
> * * * * *

c.      Mother did meet with her assigned case manager during supervised visits with [the Child], but never was involved in drug treatment by the time the case was transferred to FCM Kylie Hickmon at the end of March, 2017.

d.      During the CHINS case, Mother was unable to secure stable housing.  She lived with her grandparents a couple of different times and otherwise generally slept on friends' couches.  There was a brief period where Mother lived at her grandparents' home with her own mother and brother, but that was not continued because her brother had a substantiation for sexual molestation against Mother's older children.  Mother lived for a short time in Club Soda, a sober living environment, and then moved in with her mother until she was arrested in December 2017 for battering her mother and was kicked out of her home.

e.       Transportation was also a challenge for Mother throughout the CHINS case.  DCS gave her bus passes, but they weren't frequently utilized.

* * * * *

j.      Mother expressed feelings of anxiety and depression in August, 2017, but didn't see a doctor for those conditions until January, 2018, at which time her physician prescribed Prozac, which Mother has already discontinued.

* * * * *

5.      Termination is in the best interest of the child.

6.       The Department of Child Services has a satisfactory plan for the care and treatment of the child, which is adoption.

7.       It is in the best interests of the minor child for the parent-child relationship to be terminated.

*Id*. at 12-14.  Mother now appeals.

# Analysis

[15]      Mother challenges the termination of her parental rights.  The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children.  *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office*, 989 N.E.2d 1225, 1230 (Ind. 2013).  "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'"  *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)).  We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights.  *Id.*  Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'"  *In re K.T.K.*, 989 N.E.2d at 1230 (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[16]      When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility.  *In re. C.G.,* 954 N.E.2d 910, 923 (Ind.

2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[17] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)."[4] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

---

[4] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

    (a)  Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

    (b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[19] In appealing the trial court's order terminating her parental rights, Mother challenges only the court's finding that termination of her parental rights is in the Child's best interests. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *In re K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.*

[20] Moreover, a parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.,* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, as well as evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination of parental rights is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied.*

[21] Here, Mother's substance abuse, housing instability, and unemployment were DCS's primary concerns throughout the proceedings. As the trial court acknowledged in its order of termination, it was not until mere weeks before the

March 2018 fact-finding hearing that Mother finally began to make some positive, but insufficient, strides regarding the case plan objectives. Unfortunately, by then, the Child had been out of Mother's care for two years, and DCS had shifted its goal from reunification to adoptive placement.

[22]    DCS presented the following evidence in support of its petition for termination of Mother's parental rights. Family case manager McBride testified that, during the proceedings, Mother: (1) failed to obtain steady employment; (2) failed to obtain safe and stable housing; (3) failed to regularly submit to drug screens; (4) failed an alarming number of drug tests; (5) relapsed on methamphetamine "less than two weeks before the termination fact-finding hearing"; (6) failed to timely complete DCS's addictions assessment and substance abuse treatment; and (7) "didn't engage really in any of the services that could have been helpful to [Mother] with her addiction." App. Vol. II p. 13.

[23]    Additionally, family case manager Hickmon testified that: (1) Hickmon lacked any confidence in Mother's ability to remedy the conditions that prompted the removal of the Child; and (2) stability, structure, and permanency are vitally important for the Child, who has special needs. *See In re K.T.K.,* 989 N.E.2d at 1235 ("[A] child's need for permanency is an important consideration in determining the best interests of a child."). CASA Jukes also testified that she was "in agreement with the termination." Tr. Vol. II p. 63.

[24]    Based on the totality of the evidence, we find that DCS proved, by clear and convincing evidence, that termination of Mother's parental rights was in the

Child's best interests. We cannot conclude that the trial court's finding is clearly erroneous.

## Conclusion

The evidence is sufficient to support the termination of Mother's parental rights. We affirm.

Affirmed.

Brown, J., and Altice, J., concur.